**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF SOUTH CAROLINA**
**CHARLESTON DIVISION**

|  |  |
|---|---|
| **IN RE: ALLURA FIBER CEMENT SIDING LITIGATION**<br>This Document Applies to: All Cases | Civil Action No.: 2:19-mn-02886-DCN<br><br>**MDL No. 2886**<br><br>Honorable David C. Norton |

-----------------------------------------------------------------------------------------------------
**PLAINTIFFS' MOTION AND INCORPORATED MEMORANDUM OF LAW IN**
**SUPPORT OF PLAINTIFFS' UNOPPOSED MOTION FOR APPROVAL OF**
**ATTORNEYS FEES AND REIMBURSEMENT OF EXPENSES, AND**
**SERVICE AWARDS TO CLASS REPRESENTATIVES**
-----------------------------------------------------------------------------------------------------

Daniel K. Bryson
Scott Harris
Harper T. Segui
Whitfield Bryson, LLP
900 W. Morgan Street
Raleigh, NC 27603
Telephone: (919) 600-5000
dan@whitfieldbryson.com
scott@whitfieldbryson.com
harper@whitfieldbryson.com

Gregory F. Coleman
Rachel Soffin
GREG COLEMAN LAW PC
First Tennessee Plaza
800 S. Gay Street, Suite 1100
Knoxville, TN 37929
Telephone: (865) 247-0080
greg@gregcolemanlaw.com
rachel@gregcolemanlaw.com

Mitchell M. Breit
SIMMONS HANLY CONROY LLC

Phillip W. Segui, Jr.
SEGUI LAW FIRM PC
720 South Shelmore Boulevard,
Suite 100
Mount Pleasant, SC 29464
Telephone: (864) 884-1865
psegui@seguilawfirm.com

William F. Cash III
Matt Schultz
LEVIN, PAPANTONIO, THOMAS,
MITCHELL, RAFFERTY & PROCTOR, P.A.
316 South Baylen Street Suite 600
Pensacola, Florida 32502
Telephone: (850) 435-7059
bcash@levinlaw.com
bschultz@levinlaw.com

Michelle J. Looby
GUSTAFSON GLUEK PLLC

112 Madison Avenue
New York, NY 10016-7416
Telephone: (212) 784-6400
mbreit@simmonsfirm.com

Canadian Pacific Plaza
120 South 6th Street, Suite 2600
Minneapolis, MN 55402
Telephone: (612) 333-8844
mlooby@gustafsongluek.com

*Attorneys for Plaintiffs and the Proposed
Settlement Class*

I.    **INTRODUCTION**

Pursuant to Rule 23(e) of the Federal Rules of Civil Procedure and the Court's December 18, 2020, Order Conditionally Certifying Settlement Class, Granting Preliminary Approval of Settlement, and Approving Distribution of Class Notice (ECF No. 25) ("Preliminary Approval Order"), Plaintiffs[1] file this Unopposed Motion for Approval of Attorneys Fees and Reimbursement of Expenses, and Service Awards to Class Representatives (the "Motion").

As described in detail below and in the Unopposed Motion for Preliminary Approval of Class Settlement, for Certification of Class for Purposes of Settlement, Directing Notice to the Class, and Scheduling Final Fairness Hearing (ECF No. 21), Plycem has agreed to establish a Settlement Fund of up to $12,500,000.00, which it has begun to fund in four installments,[2] for the payment of benefits to the Settlement Class Members, as well as the costs of notice and claims administration, service awards to the Named Plaintiffs, and attorneys' fees and costs approved by the Court.

As the Court indicated in the Preliminary Approval Order, "[t]he Settlement was the result of the parties' good-faith negotiations.  The Settlement was entered into by experienced counsel and only after extensive arms'-length negotiations with the aid of an experienced mediator and without collusion."  ECF No. 15, at ¶4. Further, [t]he extensive proceedings that occurred before the Parties reached the Settlement Agreement gave counsel opportunity to adequately assess the strengths and weaknesses of the claims of the proposed Settlement Class

---

[1] Plaintiffs in the above-captioned litigation are Amanda Lowe, Krista Krouse, Christopher Krouse, Donna Johns, Jameson D. Storm, Andrew Harmel, Antonetta Luongo, and Robert Severance. The claims of Plaintiffs who do not fall within the definition of the Class have not been settled.

[2] The initial $2 million was deposited within 15 days of the Preliminary Approval Order as required by the Corrected Settlement Agreement.

Members, and thus to reach a resolution in a way that adequately accounts for those strengths and weaknesses." *Id.* at ¶5.

Through this Motion, Plaintiffs seek an order which awards Class Counsel attorneys' fees in the amount of $4,000,000.00 and expenses in the amount of $102,771.46, which represents less than 33% of the Settlement Fund, and Service Awards of $5,000.00 to pay each Named Plaintiff. In support of this Motion, Plaintiffs submit the following:

## II.    <u>SUMMARY</u>

This matter involves a nationwide settlement class of owners of single-family homes that are clad with Allura-branded fiber cement, lapboard siding containing fly-ash ("Siding"). Plaintiffs allege that due to improper design, formulation, and/or manufacturing, the Siding cracks, warps, shrinks, bows, breaks, and otherwise ages prematurely and fails under normal conditions. Plycem denies that the Siding is defective.

The Settlement was reached after more than two years of litigation; witness interviews; expert investigation and testing; product and corporate research; extensive motion briefing; exchange of written discovery requests, service of subpoenas, and review of responsive documents. In response to document requests, Plycem produced formulation logs for the Siding, sales data for the years the Siding was sold, inspection reports related to the Siding, warranty claim files, summary warranty claim information, third-party audit reports and testing data. In response to subpoenas, builders and distributors produced additional responsive materials. Further, the Parties engaged in hard-fought, arm's length negotiations over more than six months, including four days of formal mediation with Thomas J. Wills, Esq. in Charleston, South Carolina and another informal day of negotiations in Washington D.C. As a result of litigation and negotiations, Plaintiffs and Plycem have agreement on a nationwide Settlement to resolve all

claims. ECF No. 24-1. *See* Exhibit 1, Affidavit of Daniel K. Bryson ("Ex. 1, Bryson Aff"), at ¶¶6-7, 12-14, 27, 38.

## III.     RELEVANT FACTS AND PROCEDURAL HISTORY

As described herein, prior to negotiating the Settlement, Class Counsel spent significant time communicating with Plaintiffs, investigating facts, working extensively with a well-qualified engineer to procure, inspect and perform testing on various samples of Siding, researching complex issues of law, including issues related to arbitration provisions in the Allura Warranty, preparing nearly a dozen well-pleaded complaints and amended complaints, briefing multiple motions to dismiss, engaging in informal discovery with Defendant, and reviewing and analyzing important documents and data produced pursuant to Rule 408 to aid in productive and informed settlement discussions.  Ex. 1, Bryson Dec. at ¶¶ 6-7, 12-14, 26, 29, 50.

The Settlement is the product of lengthy, hard-fought litigation and arms-length negotiations, which took place over the course of numerous full-day mediation sessions and follow-up discussions with the aid of Thomas Wills, Esq., a neutral mediator who has substantial experience mediation class actions and building product litigation.

### A.  Summary of Plaintiffs' Allegations

Beginning in February of 2014, Plycem designed, formulated, and manufactured the Siding, and distributed it throughout the United States. Plaintiffs allege that the Siding contains a design, formulation, and/or manufacturing defect, resulting from the excessive use of fly-ash in its formula. Fly-ash is an industrial by-product of coal burning power plants and costs less than cement. Plaintiffs have alleged that its use by Plycem lowered the cost of its fiber cement mixture to the detriment of the quality of the Siding itself. Specifically, Plaintiffs have alleged that this use of fly ash in design and/or formulation resulted in water absorption, porosity problems, none of which were inherent in the grain and silica sand design formulations.

Although the Siding is subject to a 50-year Transferrable Limited Product Warranty ("Warranty"), Plaintiffs and other consumers have reported the Siding begins to fail within the first five (5) years after installation. Such alleged failure has reportedly manifested as cracking, warping, shrinkage, bowing, breakage, and other premature failure. Plaintiffs have further alleged that when Plaintiffs and Settlement Class Members made warranty claims, the claims were improperly denied or otherwise incomplete because the relief did not take into consideration labor and other costs.

Additionally, Plaintiffs allege that Plycem knew its Siding was defective, however, such knowledge was not disclosed to Plaintiffs, Settlement Class Members, and their contractors and builders before purchase or during warranty communications. As a result, Plaintiffs brought claims against Plycem for violations of state consumer protection statutes, breach of express and implied warranties, negligence, and strict liability.

According to Plycem's records, all of its U.S. manufacturing plants had ceased using fly-ash in its mixture by mid-2015. As Plaintiffs' alleged defect pertains to Plycem's use of fly-ash, the Settlement does not release claims for Plycem's products that do not contain fly-ash. It also does not release any claims against third-parties that relate to improper installation of the Siding.

**B.  Class Counsel's Investigation**

In response to complaints received by numerous homeowners, including Settlement Class Members, Counsel spent substantial time investigating the claims against Plycem. Prior to and during litigation, Class Counsel performed extensive corporate research, as well as research on the Siding that included building product standards, Plycem's compliance with installation instructions, representations regarding the Siding, warranties, Siding specifications and performance representations, and various other materials. Class Counsel performed home inspections and held several group meetings for homeowners who reported failures in their

Siding. Ex. 1, Bryson Dec. at ¶¶ 6-7, 12-14, 26, 29, 50. Additionally, Class Counsel engaged and worked closely with engineering experts to procure, inspect and perform microscopy and other testing on various samples of Siding, prior to filing the first action in August 2018. Those investigations continued after that filing, and included an analysis of the presence and extent of fly ash in the samples provided. *Id.*

The foregoing information was essential to Class Counsel's ability to understand the nature of Plycem's conduct and potential claims and remedies. Class Counsel expended significant resources researching and developing the legal claims at issue, analyzing information regarding the alleged defect and working with their expert to identify the alleged defect. Class Counsel is familiar with the claims as they have litigated and resolved cases with similar factual and legal issues, including numerous other building product cases. Class Counsel has experience in understanding the remedies and damages at issue, as well as determining the information critical to establish class membership. Such experience is instrumental in building product cases as the complexity in the science of design and formulation of the products, the feasibility of alternative design or formulation, the legal defenses and related issues, and damage analysis often exceeds that of other defective product cases. *See* Ex. 1, Bryson Dec. at ¶¶ 2, 4-5, 41, 45-47.There are few lawyers who possess the experience in litigation building products and their integration into homes than Lead Counsel in this case. *Id.*

### C. Relevant Factual and Procedural Background

This litigation began in August of 2018, when Plaintiffs Dominic[3] and Amanda Lowe filed a class action lawsuit against Plycem and related Defendants in the South Carolina Court of Common Pleas (Berkeley County). Following Plycem's removal of the South Carolina action to

---

[3] Mr. Lowe passed away last year, in 2020.

the United States District Court for the District of South Carolina in November of 2018, ten additional cases were filed in District Courts of nine other states (North Carolina, Iowa, Ohio, Kansas, Georgia, Minnesota, Massachusetts, Kentucky, and Florida).

Each of the eleven Complaints filed brought claims for various causes of action, including breach of consumer protection statutes, breach of warranty, and others.  In the analysis of viable causes of actions, Class Counsel had to additionally address the numerous provisions contained in the Warranty that purportedly limited remedies and recovery under the Warranty. Specifically, the Warranty contained limitations and exclusions, as well as a "Binding Arbitration" provision.    These provisions were at issue in Plycem's Motions to Dismiss, including the arbitration provision that was subject to separate Motions to Dismiss in Favor of Arbitration.  These arguments, particularly those pertaining to the validity and enforceability of the arbitration provision required Class Counsel to engage in complex legal research and analysis in opposition thereto.    In addition to this legal research, Class Counsel procured detailed affidavits from Class Representatives to further oppose arbitration.

Plycem also moved to dismiss Plaintiffs' allegations as they relate to the causes of actions raised, and raised several defenses including that the majority of the Siding does not manifest damage; the damage that has manifested is a result of mishandling and/or installation; and that it did not concealed knowledge of any defect(s). Plycem further argued that to the extent a particular homeowner's Siding manifested a problem that was covered by the Limited Warranty, Plycem honored this Limited Warranty.  Plaintiffs filed opposition briefing to several of those Motions.

Although Plycem's Motions were pending, the parties continued to move forward with discovery, particularly in the *Johns* action in the form of written discovery requests, subpoenaing

and reviewing records from several third-parties, drafting and negotiating orders pertaining to confidentiality and production of electronically stored information.

In January of 2019, one Plaintiff filed a Motion to Transfer Actions to the Southern District of Ohio Pursuant to 28 U.S.C. § 1407, with the Judicial Panel on Multidistrict Litigation ("JPML"). Plycem opposed the Motion to Transfer, citing to variations in the products and state law. Plycem further contested Ohio as Plaintiffs' proposed venue. A contested hearing was held before the JPML on March 28, 2019. Shortly thereafter, on April 2, 2019, the JPML transferred the Plaintiffs' actions to the District of South Carolina, under the MDL name *In re: Allura Fiber Cement Siding Products Liability Litigation*, MDL No. 2886.

Following transfer, the Parties engaged in the negotiation of the case management order pertaining to appointment of leadership in the MDL, mutual production of documents in response to Fed. R. Evid. 408 requests, and extensive engagement of settlement negotiations for more than six months, as more fully discussed herein.

### D.  Multiple Mediations and Subsequent Settlement Discussions

In late summer of 2019, the Parties began to explore the possibility of settlement without further, protracted litigation. The Parties notified the Court of their desire to engage in formal mediation in an attempt to resolve the litigation. The Court provided the names of suggested mediators, including Thomas J. Wills, Esq., who was later agreed upon by the Parties.

Class Counsel entered the mediation fully informed of the merits of Settlement Class members' claims. They negotiated the proposed Settlement while zealously advancing the position of Plaintiffs and Settlement Class Members. Class Counsel was and is fully prepared to continue to litigate these actions rather than accept a settlement that is not in the best interest of Plaintiffs and the Settlement Class. Thomas J. Wills, Esq. actively supervised and participated in the settlement discussions, over the course of numerous mediations and subsequent settlement

discussions, to help the Parties reach an acceptable compromise. Ex. 1, Bryson Dec. at ¶¶ 7, 23, 26-33, 38.

As shown herein, the Parties' settlement negotiations are the product of hard-fought, arm's length negotiations, which took place over the course of approximately six months, and included three (3) in person mediation sessions, and frequent follow-up discussions and negotiations with the aid of Thomas Wills, Esq., a neutral mediator who has substantial experience mediation class actions and building product litigation. During this period, the Parties engaged in extensive and detailed negotiations regarding every aspect of the Settlement and its exhibits. *Id.*

In an effort to aid productive settlement discussions, the Parties exchanged requests for documents pursuant to Fed. R. Evid. 408, and engaged in several meet and confers regarding production of documents in response to those requests. Subsequently, the Parties cooperated in rolling productions of documents in advance of mediation with Mr. Wills. *Id.*

Prior to the first mediation session, Mr. Wills held separate phone conferences with the Parties, and the Parties provided private mediation statements to him. The Plaintiffs also provided Plycem with a demand in advance of the first mediation.

On August 28, 2019, the Parties attended the first full-day mediation at the office of Mr. Wills, but were unable to resolve this matter at the first mediation. On November 7, 2019, an informal meeting was held regarding several settlement matters in Plycem's Counsel's offices in Washington, D.C. On December 16, 2019, the Parties attended a second full-day mediation at the office of Mr. Wills, at which time they remained unable to resolve this matter. Following the second mediation, the Parties attended a status conference with the Court, wherein the Court offered another opportunity for the Parties to mediate prior to scheduling hearings on Plycem's

Motions, which were to be re-filed. The Parties scheduled a subsequent two-day mediation with Mr. Wills, which took place on February 19-20, 2020.

The negotiations were complex, and were required to account for numerous factors in addition to replacement product, including labor and associated costs, the integration of the product into the home, and a threshold percentage of Qualifying Damage which would result in a total elevation replacement.  Further accounted for was the difficulty a Class Member may have in finding a contractor to perform replacement where there was less Qualifying Damage, as well as paint for elevations that did not qualify for total replacement.  Given the complexity in the issues and pricing, Plycem's engineering expert was present for almost every day of mediation and often participated in the negotiations with Class Counsel. Ex. 1, Bryson Dec., at ¶¶26-33.

As a result of the mediation process and extensive, hard-fought, arms-length negotiation, the Parties signed a Memorandum of Understanding at the conclusion the second day of mediation on February 20, 2020.

Over the course of next seven months, the Parties continued their discussions and negotiations of the finer details of the Settlement, and they worked diligently and expended a substantial amount of time and effort to finalize the terms of the Settlement Agreement, its ancillary documents, and preparation of the plan for class notice. During this time, the Parties conducted detailed negotiations regarding the language of the class notice and claim forms, and the methodology of the notice plan. These negotiations were complex and involved lengthy and repeated discussions regarding virtually every provision of the Settlement Agreement and its many exhibits, including the structure of the Settlement itself and the claims process, among a multitude of other issues.  In fact, Plycem's expert further participated in the negotiations related to installation exclusions in the Settlement Agreement.  *Id.*

Adding to the complexity of the negotiations was the 2020 COVID-19 pandemic, which resulted in related problems in the originally agreed upon terms, including the way in which the Fund was to be paid in Plycem. This resulted in additional negotiations and unforeseen issues that required unique and creative efforts by the Parties to compromise in light of the pandemic. *Id.*

Thus, the Settlement and all of its terms, including class notice and the claim process, were reached after extensive arm's-length negotiations.

## IV.    MATERIAL TERMS OF THE SETTLEMENT

The following is a general summary of the principal terms of the Proposed Settlement. The Proposed Settlement offers three Options for relief, including compensation for replacement product. The Settlement Agreement also provides for payment of Service Awards to Plaintiffs, payment of costs of notice and claims administration, payment of Class Counsel's fees and expenses, and details of the release of the Parties.

The proposed Settlement offers a substantial recovery to the Settlement Class Members and does so through a claims process that does not impose undue burden on the Settlement Class Members. The Settlement Agreement includes an appeals process and treats all similarly situated Settlement Class Members fairly and equally as the recovery is based on the quantity of materials that have experienced Qualifying Damage.

### A.    The Settlement Fund

Plycem has begun and will continue to establish a Settlement Fund that will provide payment for the benefits to the Class, as well as the costs of notice and administration, Plaintiffs' Service Awards, and attorneys' fees. The total amount of the Settlement Fund will be up to $12,500,000.00, and will be funded and replenished on an as-needed basis as follows:

1. $2,000,000.00 within 15 days of the Effective Date[4];

2. $4,000,000.00 by March 1, 2021;

3. $4,000,000.00 by September 15, 2021; and

4. $2,500,000.00 by January 15, 2022

### B.    The Settlement Class

Plaintiffs seek preliminary approval of the Settlement on behalf of the following Settlement Class:

> All individuals or entities who, as of the Effective Date, own a single-family house in the United States on which the Siding is installed. ("Settlement Class Members"). Fly-ash is presumed to be present in Allura branded fiber cement, lapboard siding that was manufactured at the following plants and installed during the identified time periods:
>
> (1) Plycem's plant in Roaring River, North Carolina and installed on homes between February 18, 2014 and September 1, 2015; or
>
> (2) Plycem's plant in White City, Oregon and installed on homes between February 18, 2014 and September 1, 2014.

Excluded from the Settlement Class are

> (1) all persons who timely opt-out of this Settlement under Federal Rule of Civil Procedure 23; (2) owners of multi-family and commercial buildings; (3) Plycem employees; and (4) the Judge to whom this case is assigned and any member of the Judge's immediate family.

> The Parties agree that the Settlement Class includes tens of thousands of members.

### C.    Class Benefits

Settlement Class Members eligible for relief under the Settlement will receive compensation for replacement product, labor, and related costs. The amount of compensation depends on which compensation option the claimant selects, and accounts for a threshold level of damage that will result in total elevation replacements. Settlement Class Members with

---

[4] This began on January 4, 2020.

Qualifying Damage on less than 30% of an Elevation will receive compensation for the portion of the elevation with Qualifying Damage. Claimants with Elevations experiencing Qualifying Damage on 30% or more of an Elevation will be eligible for compensation for the entire Elevation. Any claimant with an Elevation with less than 30% of Qualifying Damage will be eligible to receive an additional paint allowance to compensate for aesthetic issues associated with partial repairs of the Siding. Notably, the compensation will not be reduced to account for proration related to the age of the Siding.

As defined in section 1.23 of the Settlement Agreement, Qualifying Damage includes a board of Siding that has experienced cracking, bowing, shrinking, warping, breakage, or gapping (greater than 3/16"). Significantly, Replacement Area is defined as follows:

- For each Elevation where Qualifying Damage exists on 30% or more of the entire elevation, then that Elevation's Replacement Area will be the entire Elevation.

- For each Elevation where Qualifying Damage exists on less than 30% of the entire Elevation, then that Elevation's Replacement Area will be limited to the square footage containing Qualifying Damage

As described herein, Settlement Class Members will have the following three Options with regard to Qualifying Damage and the Replacement Area:

Option 1: "Replacement and Repair." The Class Member electing this Option will receive:

- $1 per square foot towards the cost of primed fiber cement board equal to the size of the Replacement Area

- $4.75 per square foot of Replacement Area to contribute to additional repair costs, including installation labor, paint, home wrap, trim, and all other repairs and/or incidental work ("Additional Costs");

- An additional $200 if the total Replacement Area is 20 boards or fewer; and

- a paint allowance of $1.00 per square foot for the entire Elevation where the Replacement Area is less than 30% of the Elevation.

This is the procedure for this option:

- Within 30 days after final approval of the Claim, the Claims Administrator will pay 30% of the amount of Additional Costs described above.

- The Settlement Class Member must then perform repairs, including replacing the Siding that was determined to be in the Replacement Area.

- The Settlement Class Member must provide proof of repair to the Claims Administrator, who must promptly review the proof and accept or deny it.

- Within 30 days after proof of repair is accepted by the Claims Administrator, the Claims Administrator will pay the remaining 70% of Additional Costs.

Option 2: "Quick Cash Option." The Claims Administrator will pay the Settlement Class Member $4.25 per square foot of Qualifying Damage. The Claims Administrator will pay 100% of the amount within 30 days of final approval of the Claim. This option provides compensation solely for Siding exhibiting Qualifying Damage.

Option 3: "Cash Option with Proof of Repair." This option is initially only available for claims with Qualifying Damage that does not exceed 30% of an Elevation. Under this option, the Claims Administrator will pay $4.25 per square foot of Qualifying Damage within 30 days after final approval. If the Settlement Class Member then provides sufficient proof of repair for the entire Elevation, the Claims Administrator will pay the Settlement Class Member $4.25 per square foot of the remaining portions of the Elevation.

## V.    CLASS COUNSEL'S FEE REQUEST MEETS THE SEVEN FACTORS FOR A PERCENTAGE OF A COMMON FUND OUTLINED IN *CENDANT*, AS WELL AS THE LODESTAR CROSSCHECK IN *BARBER*.

In the Fourth Circuit, "it is well-settled that, "[w]hen a class settlement results in a common fund for the benefit of class members, reasonable attorney's fees may be awarded from

the common fund." *Robinson v. Carolina First Bank NA*, 2019 U.S. Dist. LEXIS 103831, at *36-37 (D. SC. June 21, 2019), quoting *Smith v. Res-Care, Inc.*, No. 3:13-cv-5211, 2015 U.S. Dist. LEXIS 145266, 2015 WL 6479658, at *7 (S.D.W. Va. Oct. 27, 2015) (citing Fed. R. Civ. P. 23(h)); *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478, 100 S. Ct. 745, 62 L. Ed. 2d 676 (1980)).

In this Circuit, when Class Counsel seek fees pursuant to a percentage of a common fund in a class action settlement, there are two general methods for assessing awards of attorney's fees, including (1) the percentage-of-the-fund method set forth in *In re Cendant Corp. PRIDES Litig.*, 243 F.3d 722, 733 (3d Cir. 2001) ("*Cendant*"), and (2) a lodestar multiplier cross-check *Barber v. Kimbrell's Inc.*, 577 F.2d 216 (4 Cir. 1978) ("*Barber*"). *See Anselmo v. West Paces Hotel Group*, No. 9:09-cv-02466-DCN (J. Norton), 2012 U.S. Dist. LEXIS 164618, at *10-11 (D. SC. Nov. 19, 2012), citing *Cendant* and *Barber*. As detailed below, the factors courts consider under the percentage of the fund method set forth in *Cendant* and the lodestar multiplier cross-check set forth in *Barber* are readily met here.

## A. Application of the Percentage of the Fund Method Supports the Award of Attorneys' Fees.

"In the context of class actions, the vast majority of courts use the percentage of recovery method, which is advantageous because it ties the attorneys' award to the overall result achieved rather than the number of hours worked." *Robinson*, 2019 U.S. Dist. LEXIS 103831, at *39, quoting *McClaran v. Carolina Ale House Operating Co., LLC*, No. 3:14-cv-03884-MBS, 2015 U.S. Dist. LEXIS 112985, at *6-7 (D.S.C. Aug. 26, 2015) (citing *Loudermilk Servs., Inc. v. Marathon Petroleum Co., LLC*, 623 F. Supp. 2d 713, 717-18 (S.D. W. Va. 2009)).

As one District of North Carolina court recently stated in awarding attorneys' fees based on a fund stated:

Many courts in the Fourth Circuit have held that attorneys' fees in the amount of 1/3 of the settlement fund is reasonable. *See, e.g., Chrismon v. Meadow Greens Pizza, LLC,* No. 5:19-cv- 155-BO, 2020 U.S. Dist. LEXIS 119873, *12 (E.D.N.C. July 7, 2020) (collecting cases); *Kelly v. Johns Hopkins Univ.,* 2020 U.S. Dist. LEXIS 14772 at *8 (D. Md. Jan. 28, 2020) ("Contingent fees of up to one-third are common in this circuit.") (collecting cases); *Thomas v. FTS USA, LLC,* 2017 WL 1148283, at *5 (E.D. Va. Jan. 9, 2017) (citing *In re Rite Aid Corp. Sec. Litig.,* 146 F. Supp. 2d 706, 735 (E.D. Pa. 2001) (reviewing 289 class action settlements and finding an "average attorney's fees percentage [of] 31.31 %" and a median of roughly one-third of the common fund)).

*Childress, et al. v. JPMorgan Chase Bank, N.A.,* Case 5:16-cv-00298-BO, D.E. 360 (D.N.C., October 10, 2020).

Here, the fee request of approximately 32% of the common fund[5] is likewise "reasonable in light of all pertinent factors, including precedent and beneficial results obtained." *Anselmo v. West Paces Hotel Group,* 2012 U.S. Dist, LEXIS 164618, at *10-11,citing *Kidrick v. ABC Television & Appliance Rental, Inc.,* No. 97-cv-0069, 1999 U.S. Dist. LEXIS 23693, 1999 WL 1027050, at *2 (N.D.W. Va. May 12, 1999) (noting that use of a percentage method of calculating attorneys' fees is favored in class action settlements where there is a common fund, and that awards of 30%, 35%, and even 50% have been held reasonable).

Further, as detailed below, Class Counsel's fee request meets the following seven factors identified in *Cendant* when evaluating the percentage of the fund method:

1. the results obtained for the Class;

2. objections by members of the class to the settlement terms and/or fees requested by counsel;

3. the quality, skill, and efficiency of the attorneys involved

4. the complexity and duration of the litigation;

---

[5] Plaintiffs' fee request of $4,000,000.00 is approximately 32% of the $12,500,000.00 common fund.

5. the risk of nonpayment;

6. Public policy; and

7. awards in similar cases.

*Anselmo*, 2012 U.S. Dist. LEXIS 164618, at *10-11, citing *Cendant*, 243 F.3d at 733.

### 1. The Results Obtained for The Class.

The Fourth Circuit has acknowledged that "'the most critical factor' in calculating a reasonable fee award 'is the degree of success obtained.'" *Mullinax v. Parker Sewer & Fire Subdistrict,* 2014 U.S. Dist. LEXIS 199340, at *39 (D. SC. Mar. 11, 2014), citing *Brodziak v. Runyon*, 145 F.3d 194, 196 (4th Cir. 1998). The results achieved here are exemplary and comprehensive, and were reached after over two years of litigation, substantial product and corporate research, expert investigation and testing, exchange of relevant discovery, witness interviews and hard-fought, arms-length negotiations that took place over the course of several months, including three in-person mediations and numerous follow-up discussions with the aid of a qualified and neutral mediator.

The Settlement provides substantial benefits to Class Members.  As described herein, Plaintiffs alleged that due to improper design, formulation, and/or manufacturing, the Siding in their homes cracks, warps, shrinks, bows, breaks, and otherwise ages prematurely and fails under normal conditions as a result of Plycem's use of fly ash in the design and/or formulation of the Siding. Here, Plaintiffs were able to hold Plycem accountable for their use of fly ash in the Siding, which Plaintiffs alleged caused premature failure of the Siding, as well as provide relief not otherwise permitted by the Warranty. As detailed further in the Settlement Agreement, Settlement Class Members with Qualifying Damage to their Siding will have the three options for the compensation, including: (1) Replacement and Repair; (2) Quick Cash; or (3) Cash with Proof of Repair.  This relief is significant.  *See In re MI Windows & Doors Prods. Liab. Litig.,*

2015 U.S. Dist. LEXIS 95889, at *8-9 (D. SC. July 23, 2015) (in class action regarding defective windows, finding relief including "the possibility of repairs, replacement products, or monetary compensation for consequential damages" constituted "significant relief" for class members).

**2. Objections by Members Of The Class To The Settlement Terms And/or Fees Requested By Counsel.**

To date, there have been no objections to the Settlement. Class Counsel will supplement upon receipt of any objection.

**3. The Quality, Skill, And Efficiency of The Attorneys Involved.**

In the Preliminary Approval Order, this Court previously found that "[t]he Named Plaintiffs are represented by counsel who are experienced and competent in the prosecution of complex class action litigation." ECF No. 25 at ¶12. Further, as shown above, Class Counsel achieved a Settlement that confers substantial benefits to the Settlement Class Members despite the hard-fought litigation against a sophisticated and well-financed defendant represented by top-tier counsel. This outstanding result was made possible by Class Counsel's extensive experience litigating class actions of similar size, scope, and complexity. This litigation required a high degree of skill and experience given the complexity of the issues. Class Counsel employed their significant experience gained from litigating numerous class actions across the country, in both state and federal court, including defective product class actions, among others.

**4. The Complexity and Duration of The Litigation.**

As described above, this Settlement is the product of more than two years of litigation, which began in August of 2018, when Plaintiffs Dominic and Amanda Lowe filed a class action lawsuit against the Plycem Defendants in the South Carolina Court of Common Pleas (Berkeley County). Following Plycem's removal of the South Carolina action to the United States District Court for the District of South Carolina in November of 2018, ten additional cases were filed in

District Courts of nine other states (North Carolina, Iowa, Ohio, Kansas, Georgia, Minnesota, Massachusetts, Kentucky, and Florida). In January of 2019, following a Motion to Transfer Actions to the Southern District of Ohio Pursuant to 28 U.S.C. § 1407, with the Judicial Panel on Multidistrict Litigation ("JPML") and a contested hearing held before the JPML on March 28, 2019, on April 2, 2019, the JPML transferred the Plaintiffs' actions to the District of South Carolina, under the MDL name *In re: Allura Fiber Cement Siding Products Liability Litigation*, MDL No. 2886.

As referenced above, Plycem sought to dismiss the cases filed by the Plaintiffs, arguing that Plaintiffs failed to state and claim and that the claims must be pursued in arbitration pursuant to the Limited Warranty. Plaintiffs filed oppositions to those Motions, which included substantial affidavits from Plaintiffs. Although Plycem's Motions were pending, the parties continued moved forward with discovery, particularly in the *Johns* action, as described above.  In addition, the parties engaged in extensive settlement negotiations for more than six months, followed by another seven months of negotiating the finer details of the settlement, its ancillary documents, and preparation of the plan for class notice.

Moreover, prior to and during litigation, Plaintiffs' counsel performed extensive corporate research, as well as research on the Siding and building product standards, Plycem's compliance with installation instructions, representations regarding the Siding, warranties, Siding specifications and performance representations, and various other materials. Additionally, Plaintiffs engaged engineering experts to inspect and perform testing on various samples of Siding. Further, the Parties have engaged in extensive motions practice, and discovery.

As described above, the complexity of this building product defect case exceeds that of the average product defect case in investigation, legal analysis, negotiations, and settlement structure.

### 5. The Risk of Nonpayment.

This case involved difficult and novel issues that presented a significant risk of nonpayment. The claims and defenses in this action are complex. Plaintiffs faced the risk of being compelled to arbitration, as well as losing at class certification, summary judgment, at trial, or on appeal. The risks and obstacles in this case are just as great as those in other building product defect class actions and this case would likely have taken years to successfully prosecute, with the risk that there would be no recovery at all.

If this action was not settled and was required to proceed to trial, the Parties would incur significant additional expenses, including the further payment of expert witnesses and technical consultants, along with substantial time devoted to briefing Plaintiffs' motion for class certification, *Daubert* motions, and summary judgment motions, preparing for and conducting trial, post-trial motion practice, and appeal, all of which could have impacted the recovery in this Action. The proofs necessary to prevail at trial would be greater than what is required under the Settlement. This Settlement represents an efficient alternative to what may otherwise be a prolonged and complex class action.

### 6. Public Policy.

Public policy weights in favor of granting Plaintiffs' Motion in light of the fact that many Plaintiffs would not have pursued their claims individually. In situations like this case, where each individual's economic damages may be relatively modest, obtaining counsel would be extremely difficult. There are few lawyers willing to invest significant time and resources prosecuting a lawsuit that involves complicated and uncertain legal questions and a substantial

risk of receiving no compensation, which is evidenced by the fact that, to Class Counsel's knowledge, no other related class actions were filed elsewhere in the Country by other counsel. Although Class Counsel managed to achieve an excellent result for the Settlement Class, this outcome was anything but certain until shortly before the Settlement was reached. Therefore, public policy favors adequate awards of attorney's fees to encourage aggrieved plaintiffs to bring these actions and to provide incentives for plaintiffs' counsel to take such cases. *See Anselmo*, 2012 U.S. Dist. LEXIS 146618, at *13 (granting motion for attorneys' fees in class action, including 33% of the common fund, finding "public policy weighs in favor of granting Class Counsel's Attorney's Fees in this class action in light of the fact that many Plaintiffs would not have pursued their claims individually.").

### 7. Awards in Similar Cases.

"[A]ttorneys' fee awards based upon contingency contracts are regularly approved by courts." *See Anselmo*, 2012 U.S. Dist. LEXIS 146618, at *13 (granting motion for attorneys' fees in class action, including 33% of the common fund, noting such amount "is reasonable in light of all pertinent factors, including precedent and beneficial results obtained"), citing *Kidrick*, 1999 U.S. Dist. LEXIS 23693 (noting use of percentage of the fund method of calculating attorneys' fees is favored in class action settlements and that awards of 30%, 35% and even 50% have been found reasonable.).

In building product cases, "attorneys' fee awards are often substantial. *See In re MI Windows & Doors Prods. Liab. Litig.,* 2015 U.S. Dist. LEXIS 95889, at *8-9, citing See, e.g*., In re Zurn Pex Plumbing Products Liab. Litig.*, 2013 U.S. Dist. LEXIS 27155, 2013 WL 716460, at *1 (D. Minn. Feb. 27, 2013) (approving attorneys' fees and expenses of $8.5 million in litigation concerning brass plumbing fittings in which common fund settlement was $20 million); *In re*

*CertainTeed Fiber Cement Siding Litig.*, 303 F.R.D. 199, 205 (E.D. Pa. 2014) (approving attorneys' fees and expenses of $18.5 million in litigation concerning cement siding in which common fund settlement was $103.9 million).

### B. Application of The Lodestar Crosscheck Supports an Award Of Plaintiffs' Attorneys Fees

As an additional safeguard in evaluating attorney fee awards, the Fourth Circuit has employed the lodestar multiplier cross-check set forth in *Barber*, 577 F.2d at 226, which includes the following factors:

> (1) the time and labor expended; (2) the novelty and difficulty of the questions raised; (3) the skill required to properly perform the legal services rendered; (4) the attorney's opportunity costs in pressing the instant litigation; (5) the customary fee for like work; (6) the attorney's expectations at the outset of the litigation; (7) the time limitations imposed by the client or circumstances; (8) the amount in controversy and the results obtained; (9) the experience, reputation and ability of the attorney; (10) the undesirability of the case within the legal community in which the suit arose; (11) the nature and length of the professional relationship between attorney and client; and (12) attorneys' fees awards in similar cases.

The *Barber* factors are discussed in order below, although many of them overlap with the *Cendant* factors discussed above.

### 1. The Time and Labor Required (First, Seventh and Eleventh *Barber* Factors).

As set forth above, Class Counsel spent significant time communicating with Plaintiffs, investigating facts, working extensively with a well-qualified engineer to inspect and perform testing on various samples of Siding, researching the law, preparing well-pleaded complaints and amended complaints, litigating motions to dismiss filed by Plycem, engaging in informal discovery with Defendant, and reviewing and analyzing important documents and data produced pursuant to Rule 408 to aid in productive and informed settlement discussions.

Further, as described in the declaration of Daniel K. Bryson, attached hereto as Exhibit A, Class Counsel have expended more than 3,400 hours of attorney time in connection with this

23

matter. These hours were reasonable in light of the complexity and procedural posture of the case, and care was taken to avoid duplication of efforts and appropriately divide tasks amongst Plaintiffs' Steering Committee members. *See* Ex. 1, Bryson Dec. at ¶¶ 76, 49. Similarly, a reduced number of those members attended mediation also to avoid duplication of time. *Id.*

The undersigned initiated this case in August 2018, but spent substantial time investigating the claims at issue for several months before initiating this action, and participating in the litigation discussed herein. As set forth in the Bryson declaration, the amount of time and labor expended in this case is reasonable. This considerable time and labor was necessary to ensure this excellent result for Plaintiff and the Class, while avoiding the unnecessarily high costs associated with commencing litigation. *See* Ex. 1, Bryson Dec. at ¶¶41-48.

## 2. Novelty and Difficulty of the Issues, and the Skill and Experience Required to Litigate Them, and the Undesirability of the Case in the Legal Community (Second, Third, Ninth and Tenth *Barber* factors)

As discussed, above, building product cases are complex and difficult to litigate, and few attorneys are willing and able to prosecute building product class actions. *See* Ex. 1, Bryson Dec. at ¶¶4-5. The difficulty of this case is appropriately reflected in the hours and time spent investigating and litigating this action.

The difficult and contingent nature of this case also demonstrates its undesirability. As further discussed herein, there are few lawyers willing to invest significant time and resources prosecuting a lawsuit that involves complicated and uncertain legal questions and a substantial risk of receiving no compensation, which is evidenced by the fact that, to Class Counsel's knowledge, no other related class actions were filed elsewhere in the Country. *See Reed v. Big Water Resort, LLC,* 2016 U.S. Dist. LEXIS 187745, at *31 (D. SC. May 26, 2016) (in granting

approval of fees in class action settlement, finding relevant that "[n]o other law firm took on this case, nor attempted to represent any of the [class] members in pursuing claims…")

Class Counsel is familiar with the claims as they have litigated and resolved cases with similar factual and legal issues. Class Counsel has experience in understanding the remedies and damages at issue, as well as determining the information critical to establish class membership. As the Court noted in the Preliminary Approval Order, "[t]he Named Plaintiffs are represented by counsel who are experienced and competent in the prosecution of complex class action litigation," and "[t]he extensive proceedings that occurred before the Parties reached the Settlement Agreement gave counsel opportunity to adequately assess the strengths and weaknesses of the claims of the proposed Settlement Class Members, and thus to reach a resolution in a way that adequately accounts for those strengths and weaknesses." Dkt. No. 25, at ¶¶5, 13.

3. **Counsel's Expected Compensation, The Customary Fee for Like Work, and the Preclusion of Other Employment (Fourth, Fifth, Sixth, and Twelfth *Barber* Factors).**

These factors are similar to the fifth *Cendant* factor discussed above. Counsel undertook to prosecute this action without any assurance of payment for their services, litigating this case on a wholly contingent basis. Class Counsel received no compensation during the course of this litigation and have incurred significant unpaid fees and costs. Such a substantial risk of nonpayment in return for advancing all the costs and fees weighs heavily in favor of finding Class Counsel's requested award reasonable. *See Reed,* 2016 U.S. Dist. LEXIS 187745, at *27-28 ("In complex and multi-year class action cases, the risks of litigation are immense and the risk of receiving little or no recovery is a major factor in awarding attorney's fees."), citing *Savani v. URS Prof'l Solutions LLC*, C/A No. 1:06-cv-02805-JMC, 2014 U.S. Dist. LEXIS 5092, 2014 WL 172503, at *5 (D.S.C. Jan. 15, 2014) (citing *Phillips v. Crown Cent. Petroleum Corp.*, 426 F.

Supp. 1156, 1170 (D. Md. 1977)). Further, "[e]ven if Plaintiffs had prevailed at class certification in some form, no judgment could have been secured until many additional steps, including dispositive motions, Daubert motions, trial, and potentially appeals, had been completed," which weights in favor of granting the requested fee. *Id.*

Here, Class Counsel's hourly rates are conservatively based on adjusted Laffey Matrix rates, which are comparable to those rates charged in South Carolina, despite the fact that this case is national in scope and required construction and product defect class action specialists from across the country who typically charge higher rates.[6]

Over the course of more than two and a half years of litigation, partners, associates, and paralegals in this action collectively billed more than 3,400 hours. Ex. 1, Bryson Dec. at ¶¶ 6-7. Based upon the Laffey Matrix rates from 2018 when litigation was initiated: attorneys with 20 years or more experience are billed at an hourly rate of $894.00; attorneys with 11-19 years of practice experience are billed at an hourly rate of $742.00; attorneys with 8-10 years of experience are billed at $658.00; attorneys with 4-7 years of experience are billed at $455.00; and attorneys with 1-3 years of experience are billed at $371.00. Paralegals and law clerks are bill at $150.00, despite a Laffey Matrix rate of $202.00. *Id.* at ¶10, 47, 52.

Courts in the Fourth Circuit have previously determined that using Laffey and Adjusted Laffey rates were appropriate when reviewing lodestar in approving fee petitions. *Brown v. Transurban USA, Inc.*, 318 F.R.D. 560, 575- 577 (E.D. Va., September 29, 2016), *citing e.g. In re NeuStar, 2015 U.S. Dist. LEXIS 165320, 2015 WL 8484438, at *10* (approving rates of $260-$310 for paralegal services, $420-$700 for associates, and $800-$975 for partners); *Hosch v.*

---

[6]For example, some of Plaintiffs' counsel practice in New York City, where courts have regularly accepted the Laffey Matrix as a basis for determining the prevailing market rate. Under the Laffey Matrix, the market hourly rate for a partner with over 20 years of experience is more than $900/hour. http://www.laffeymatrix.com/see.html

*BAE Systems Info. Sols., Inc.*, No. 1:13-CV-00825(AJT/TCB), 2015 U.S. Dist. LEXIS 181158, 2015 WL 12227738, at *3 n.4 (E.D. Va. Apr. 28, 2015)* (approving rates of $650/hour); *Phillips v. Triad Guar. Inc.*, No. 1:09-CV-71, 2016 U.S. Dist. LEXIS 60950, 2016 WL 2636289, at *8 (M.D.N.C.May 9, 2016)* (finding that partner billing rates of $640- $880 per hour and associate billing rates of $375-$550 per hour were "within the range of reasonableness[,]"especially given that "the market for *class action* attorneys is nationwide and populated by very experienced attorneys with excellent credentials").

Further, these rates are consistent with those for complex class action attorneys operating on a contingency-basis in this District. *See McCurley v. Flowers Foods, Inc.*, No. 5:16-cv-00194-JMC, 2018 U.S. Dist. LEXIS 226234, at *19-20 (D.S.C. Sept. 10, 2018) (approving class counsel's hourly rates, ranging from $300.00 to $850.00, which reflected their usual and customary billing rates, and noting class counsel were well-respected members of the bar and experienced class action litigators, and "[t]heir rates are appropriate for complex and collective action litigation and reflect a high level of experience and skill necessary for success."); *see also In re: Household Goods Movers Antitrust Litigation*, MDL No. 1865, 2:07-cv-764-DCN, DKT Nos. 102-1, 113 (D.S.C., March 3, 2011) (granting attorneys' fees based on percentage of the fund, but where Motion was, in part, based on rates up to $850.00/hour).

Finally, Plaintiffs note that in comparable complex cases, attorneys are often not just awarded their lodestar, but a multiple thereof. *DeWitt v. Darlington Cnty., S.C.*, No. 4:11-CV-00740-RBH, 2013 WL 6408371, at *13 (D.S.C. Dec. 6, 2013) (stating that "[c]ourts have generally held that lodestar multipliers falling between 2 and 4.5 demonstrate a reasonable attorneys' fees" and that another district court in the Fourth Circuit had awarded a fee with a "lodestar multiplier between 3.4 to 4.3 times the lodestar") (internal citations and quotations

omitted); *McCurley*, 2018 U.S. Dist. LEXIS 226234, at *19-20, citing *Kay Co. v. Equitable Prod. Co.*, 749 F. Supp. 2d 455, 470 (S.D. W. Va. 2010) ("Courts have generally held that lodestar multipliers falling between 2 and 4.5 demonstrate a reasonable attorneys' fee."). Here, Class Counsel's lodestar is 3,406,[7] which is $2,301,174.00 using Adjusted Laffey of $371-$894 for lawyers and $150.00 for paralegals, which is a lodestar multiplier of 1.74. Moreover, when using more conservative rates between $300-$800 for lawyers, and $150.00 for paralegals, Class Counsel's lodestar amounts to $2,022,772.00, which is a lodestar multiplier of 1.97. Utilizing either range of rates, the lodestar multiplier is less than 2, and illustrates the reasonableness of Class Counsel's fee request.

### 4.    The Amount in Controversy and Results Obtained (Eighth *Barber* Factor)

This factor mirrors the first *Cendant* factor discussed above in Section III.A.I. As discussed above, Plycem has agreed to establish a Settlement Fund of up to $12,500,000.00, and as detailed further in the Settlement Agreement, Settlement Class Members with Qualifying Damage to their Siding will have the three options for the compensation, including: (1) Replacement and Repair; (2) Quick Cash; or (3) Cash with Proof of Repair. This relief is significant, and was reached after over two years of litigation, substantial product and corporate research, expert investigation and testing, exchange of relevant discovery, witness interviews and hard-fought, arms-length negotiations that took place over the course of several months, including three in-person mediations and numerous follow-up discussions with the aid of a qualified and neutral mediator. Class counsel undertook substantial responsibilities in this litigation and produced a significant result for class members and absent these efforts, it us

---

[7] Bryson Dec. Ex. B.

unlikely class members would have been able to obtain adequate representation or any relief at all. *Reed*, 2016 U.S. Dist. LEXIS 187745, at *30.

## VI.    Counsel Are Entitled to Reimbursement of Their Expenses.

"Courts routinely award reimbursement for expenses incurred to prosecute class actions." *McCurley*, 2018 U.S. Dist. LEXIS 226234, at *21; *Robinson*, 2019 U.S. Dist. LEXIS 103831, at *49 ("[t]he Court is authorized to award costs that are reasonable in nature.").

Here, the combined expenses incurred to purse this action include $102,771.46[8], which includes travel time, expert consulting fees, research fees, mediator fees, court fees and other costs. *See* Ex. 1, Bryson Dec., Ex. B. Class Counsel has not been paid for their extensive efforts or reimbursed for litigation costs and expenses incurred.  Class counsel took this case on a contingent basis, working without compensation and fronting litigation costs for nearly two- and one-half years. Class counsel covered all expenses and costs associated with litigation and settlement efforts and assumed the risk that they may not recover for these expenses and costs.

## VII.    Service Awards

"Incentive or service awards reward representative plaintiffs' work in support of the class, as well as their promotion of the public interest" and "[c]ourts around the country have allowed such awards to named plaintiffs or class representatives." *In re MI Windows & Doors Prods. Liab. Litig.,* 2015 U.S. Dist. LEXIS 95889, at *16-17 (granting "modest" service awards of $5,000.00 for each Named Plaintiff), citing *Deem v. Ames True Temper, Inc*., 2013 U.S. Dist. LEXIS 72981, 2013 WL 2285972, at *6 (S.D. W. Va. May 23, 2013); see also *Savani v. URS Prof'l Solutions LLC*, No. 1:06-cv-02805, 2014 U.S. Dist. LEXIS 5092, 2014 WL 172503, at *10

---

[8] The maximum amount of Attorneys' Fees and Costs for which Class Counsel may apply pursuant to paragraph 10.2 of the Settlement Agreement is 33% of the total value of the settlement, including the Settlement Fund (or up to $4,125,000.00, if based solely on the fund). The application for attorneys' fees and costs is $4,102,771.46.

(D.S.C. Jan. 15, 2014) (citation omitted). "To determine whether an incentive payment is warranted, the court should consider the actions the plaintiff has taken to protect the interests of the class, the degree to which the class has benefitted from those actions, and the amount of time and effort the plaintiff expended in pursuing the litigation." *In re MI Windows & Doors Prods. Liab. Litig.,* 2015 U.S. Dist. LEXIS 95889, at *16-17, citing *Kirven v. Cent. States Health & Life Co. of Omaha,* No. 3:11-cv-2149, 2015 U.S. Dist. LEXIS 36393, 2015 WL 1314086, at *13 (D.S.C. Mar. 23, 2015) (citation omitted). *See also Robinson,* 2019 U.S. Dist. LEXIS 103831, at *51-52 (granting service award of $15,000.00 to named plaintiff for her assistance in class counsel's investigation and prosecution of claims, finding the award was well within the range of reasonable incentive awards), citing *McCurley v. Flowers Foods, Inc.*, No. 5:16-cv-00194-JMC, 2018 U.S. Dist. LEXIS 226234, 2018 WL 6650138, at *8 (D.S.C. Sept. 10, 2018) (collecting cases).

Here, as part of the Settlement, subject to Court approval, Plycem has agreed to pay Service Awards of $5,000.00 to each of the Proposed Class Representatives in this action in recognition of the time and effort they personally invested in this litigation. Proposed Class Representatives' efforts include instigating and filing of the Complaints, providing support to Class Counsel of their claims and attempts to resolve those claims with Plycem, providing documents to support the litigation, maintaining regular contact with Class Counsel regarding the status of their case, and otherwise working with Class Counsel to prosecute and resolve this action on behalf of all Settlement Class Members in the United States.

## VIII.  CONCLUSION

Based upon the foregoing, and attached Declaration of Daniel K. Bryson, Class Counsel respectfully requests that this Motion be granted.

This 7th day of January, 2021          Respectfully submitted,

_Daniel K. Bryson_
Daniel K. Bryson
WHITFIELD BRYSON LLP
900 West Morgan Street
Raleigh, NC 27603
(919) 600-5000
dan@whitfieldbryson.com

*Lead Counsel for Plaintiffs*