# IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF SOUTH CAROLINA
## CHARLESTON DIVISION

| | |
|---|---|
| **IN RE: ALLURA FIBER CEMENT SIDING LITIGATION**<br>This Document Applies to: All Cases | Civil Action No.: 2:19-mn-02886-DCN<br><br>**MDL No. 2886**<br><br>Honorable David C. Norton |

### DECLARATION OF DANIEL K. BRYSON IN SUPPORT OF PLAINTIFFS' MOTION FOR APPROVAL OF ATTORNEYS' FEES AND REIMBURSEMENT OF EXPENSES, AND SERVICE AWARDS TO CLASS REPRESENTATIVES

I, DANIEL K. BRYSON, hereby declare as follows:

1.      I am Lead Counsel for Plaintiffs in this multidistrict litigation ("MDL"), having been previously appointed by this Court.  I make this Declaration in Support of Plaintiffs' Motion for Approval of Attorneys Fees and Reimbursement of Expenses and Service Awards to Class Representatives (the "Motion"). I have actively participated in this litigation, have personal knowledge of the matters set forth herein, and if called to testify, could and would testify competently thereto.

2.      My firm, Whitfield Bryson LLP, along with Segui Law Firm, PC, Greg Coleman Law, PC, Levin, Papantonio, Thomas, Mitchell, Rafferty & Proctor, P.A., Simmons Hanly Conroy, LLC, and Gustafson Gluek, PLLC (collectively "Class Counsel") and the other firms serving as local counsel have principally litigated this case and have extensive experience in prosecuting complex class actions, including significant experience in litigating building product defect class actions. The resumes of Class Counsel were previously submitted in support of Plaintiffs' Motion for Preliminary Approval of Class Settlement, and included in ECF No. 24-2.

1

EXHIBIT A

3.      Class Counsel regularly litigates complex class actions across the country, including construction product defect class actions.

4.      I have personally served as Lead Counsel in six building product MDLs, including this one.  I have served in other crucial roles in other building product class actions and multidistrict litigation.  There are few lawyers who possess the experience in litigating class actions involving building products and their integration into homes than I do.  Accordingly, I am particularly familiar with the complexity of a building product case from beginning to resolution, as well as the value of Class Counsel's time in pursuing these claims.

5.      Class Counsel's years of experience representing consumers in complex class action cases, as well as my particular experience in litigation building product cases, contributed to our ability to properly investigate the claims at issue, hire well-qualified consultants and experts in pursuit of that investigation, as well as properly and successfully litigation this multidistrict litigation.

6.      In pursuit of Plaintiffs claims against Defendants, Class Counsel expended more than 3,400 hours of time and more than $102,000.00 in costs over the span of two and a half years of litigation.  *See* Allura Master Attorney Time and Cost Inventory attached hereto as Exhibits A and B. Class Counsel's time includes investigation of Plaintiffs' claims, expert investigation, discovery, complex legal analysis and briefing, as well as more than a year of settlement negotiations further complicated by the COVID-19 pandemic.

7.      To date, this Declaration follows more than two years of litigation, including the above-referenced investigations, expert work, opposed formation of this MDL, briefing complex legal issues such as arbitration validity and enforceability, and hard-fought settlement

negotiations over the course of several days of mediation and negotiations with the aid of a neutral mediator with substantial building products litigation experience, Thomas Wills, Esquire

8.    As a result, Class Counsel negotiated a nationwide settlement class of owners of single-family homes that are clad with Allura-branded fiber cement, lapboard siding containing fly-ash ("Siding").

9.    The settlement reached by the Parties is complex and offers multiple options to Settlement Class Members; options which account for the practical replacement of the product itself in the context of the product's placement on the homes at issue, provide for labor and other costs not provided by the 50 Year Transferable Limited Product Warranty ("the Warranty"), and includes practical factors such as entire elevation replacements and paint costs, as well as costs associated with smaller replacements.  Most importantly, this settlement is to be supported by a Settlement Fund in the amount of up to $12,500,000.00 to pay for the costs of notice, approved claims,

10.    Accordingly, this Declaration is submitted in support of Class Counsel's unopposed request for Service Awards of $5,000.00 per Class Representative, attorneys' fees of $4,000,000.00 or 32% of the Settlement Fund, and reimbursement of costs, further detailed herein.  This fee is supported by precedent in the Fourth Circuit, as detailed in the Motion, and is further supported by the attorneys' fee lodestar that has accumulated in this litigation at a modest multiplier of approximately two, utilizing adjusted rates approved by courts in this District as well as Laffey Matrix[1] hourly rates, which are considerably lower than several of Class Counsel's typical hourly rates.

## Background and Relevant Procedural History

---

[1] http://www.laffeymatrix.com/see.html

11.    This litigation began after Class Counsel received complaints in 2018 about potentially defective Allura branded fiber cement siding that was cracking, warping, shrinking, bowing, breaking, and otherwise prematurely and failing under normal conditions.

12.    Class Counsel began performing investigations of these claims and damages, including the similarity between this product and the CertainTeed fiber cement siding product, which was the subject of settled multidistrict litigation.

13.    Initially, Class Counsel performed extensive corporate research, as well as research on the Siding that included building product standards, Plycem's compliance with installation instructions, representations regarding the Siding, warranties, Siding specifications and performance representations, and various other materials. Class Counsel interviewed witnesses, performed home inspections and held several group meetings for homeowners who reported failures in their Siding.

14.    In furtherance of the investigation into the cause of the product failure and damage, Class Counsel spent significant time working with a well-qualified engineer to procure, inspect and perform testing, including microscopy and materials testing, on various samples of Siding.

15.    The first Complaint was filed in August of 2018, in the South Carolina Court of Common Pleas (Berkeley County).  Following Plycem's removal of the South Carolina action to the District Court of South Carolina in November of 2018, Class Counsel filed ten additional cases in District Courts of nine other states (North Carolina, Iowa, Ohio, Kansas, Georgia, Minnesota, Massachusetts, Kentucky, and Florida).

16.     Each of the lawsuits alleged that the Siding was defective due to improper use of excessive fly-ash in the Siding's formulation, resulting in the documented cracking, warping, shrinkage, bowing, breakage, and premature failure.

17.     In response to the filings of these cases, Defendants hired well-qualified and experienced building products and class action attorneys – Troutman Pepper f/k/a Pepper Hamilton, LLP– to provide a vigorous defense.   Defendants, through counsel, vigorously defended the claims in this action. Defendants denied, and continue to deny, that the Siding was defective or that it harmed Plaintiffs or any individuals in the Class they seek to represent. Defendants had filed and planned to continue to file numerous Motions to Dismiss, including those in favor of arbitration.

18.     I am very familiar with the complexity and difficulty in overcoming arbitration provisions, having opposed many similar motions to compel arbitration in other cases. Oftentimes, arbitration clauses are insurmountable obstacles to successfully pursuing class action litigation in products cases, including building products.   However, Class Counsel spent a considerable amount of time analyzing, researching, and briefing the arbitration issues raised by Defendants in this case.

19.     In fact, Class Counsel filed oppositions to several of the Motions to Dismiss, including those involving arbitration issues which required procurement of detailed affidavits from several Class Representatives.

20.     Although Plycem's Motions were pending, litigation moved forward and Plaintiffs served written discovery requests, subpoenaed and reviewed records from several third-parties, drafted and negotiated orders pertaining to confidentiality and production of electronically stored information/

21.    On January of 2019, Ohio Plaintiff, Shara Guinn, filed a Motion to Transfer Actions to the Southern District of Ohio Pursuant to 28 U.S.C. § 1407, with the Judicial Panel on Multidistrict Litigation ("JPML"). Plycem opposed the Motion to Transfer, citing to variations in the products and state law. Plycem further contested Ohio as Plaintiffs' proposed venue. A contested hearing was held before the JPML on March 28, 2019. Shortly thereafter, on April 2, 2019, the JPML transferred the Plaintiffs' actions to the District of South Carolina, under the MDL name *In re: Allura Fiber Cement Siding Products Liability Litigation*, MDL No. 2886.

22.    Following transfer of the case into this MDL, the Parties further engaged in negotiations of a leadership Case Management Order and met to discuss the litigation moving forward. At the initial status conference, the Parties agreed to attempt to engage in settlement negotiations.

23.    Consequently, the Parties performed additional work, including Fed. R. Evid., 408 discovery, resulting meet and confers, mediation briefing, and consultations with mediator, Thomas J. Wills, Esq.

24.    As the Court is aware, those settlement negotiations began in the fall of 2019 and continued through numerous mediations and settlement meetings until the case was resolved in February of 2020. The Parties then spent another seven months negotiating the terms of the Settlement Agreement, as well as the numerous exhibits in support thereof.

25.    In the event litigation had continued, or was to continue, Defendants maintain they would re-file their numerous Motions to Dismiss, including those in favor of arbitration, and argue in support thereof with the Court. Substantively, Defendants would continue to oppose Plaintiffs' claims that the Siding is defective and would attempt to demonstrate that the vast majority of Siding did not manifest the alleged defect or damages. In addition, Defendants would

oppose any Motion for Class Certification filed by the Plaintiffs, arguing that class certification is improper because there is no common defect, and any damage to the Siding is the result of installation or other handling errors.

### The Settlement Achieves an Excellent Result for the Settlement Class and Is the Result of Extensive Investigation, Hard-Fought Litigation, and Arms-Length Negotiations

26.     The Settlement was reached only after Class Counsel engaged in substantial investigation of the alleged fly-ash related Defect in the Siding through consumer interviews, inspection, testing, and analysis of the Siding by a well-qualified engineering consultants, review of installation instructions, building codes, specifications, and industry standards, as well as relevant discovery, and complex motion practice.

27.     The Parties' mediated settlement negotiations began in the fall of 2019, and continued over the course of approximately six months, and included three (3) in person mediation sessions, an informal settlement meeting in Washington D.C., and frequent follow-up discussions and negotiations with the aid of Thomas Wills, Esq., a neutral mediator who has substantial experience mediation class actions and building product litigation.

28.     To aid in the negotiations the Parties exchanged and reviewed critical documents and information pursuant to Fed. R. Evid., Rule 408.  Included in the multiple productions were Defendants' sales and formulation records, which enabled Class Counsel to properly evaluate the Class Period, Class size, and other crucial information in establishing the settlement structure during negotiations.  The Parties held meet and confers regarding the materials exchanged, and Class Counsel utilized this information when proposing a settlement structure and initial demand.

29.     Thus, Plaintiffs and Class Counsel entered into settlement negotiations with substantial information about the nature and extent of the challenged Siding, and the merits of

the legal claims and factual allegations. Plaintiffs and Class Counsel had the benefit of an engineering consultant's testing and investigation of the Siding, as well as the ability to review key documents in this matter.

30.     Review of this information positioned Class Counsel to evaluate with confidence the strengths and weaknesses of Plaintiffs' claims and prospects for success at class certification, summary judgment, and trial.

31.     The negotiations with Defendants were complex, and involved detailed, lengthy and repeated discussions regarding the practicalities of replacing portions of home elevations, the ability to obtain contractors to perform smaller replacement work, the effect of paint matching where elevations were not being replaced, reasonable labor and associated costs of replacing the Siding.  Consequently, virtually every provision of the Settlement Agreement and its many exhibits were subject to extensive negotiations, including the structure of the Settlement itself and the claims process, and a myriad of other related issues.

32.     The crux of the settlement negotiations was the establishment of the $12,5000.000.00 Settlement Fund to pay for the costs of notice, the claims deemed eligible, and the attorneys' fees and reimbursement of costs.

33.     Over a span of approximately seven more months, the Parties worked diligently and expended a substantial amount of time and effort to finalize the terms of the Settlement Agreement and ancillary documents, and the plan for class notice, which was completed in October of 2020 after combatting Defendants' financing issues resulting from the COVID-19 pandemic.  During this time, the Parties conducted detailed negotiations regarding the language of the class notice and claim forms, and the methodology of the notice plan. *Id.*

34.    In October of 2020, the Parties filed their Motion for Preliminary Approval of the

Proposed Class Settlement (ECF No. 24), which the Court granted on December 18, 2020 (ECF

No. 25).

35. The Settlement Class consists of the following:

> All individuals or entities who, as of the Effective Date, own a single-family
> house in the United States on which the Siding is installed. ("Settlement Class
> Members"). Fly-ash is presumed to be present in Allura branded fiber cement,
> lapboard siding that was manufactured at the following plants and installed during
> the identified time periods:
>
> (1) Plycem's plant in Roaring River, North Carolina and installed on homes
> between February 18, 2014 and September 1, 2015; or
>
> (2) Plycem's plant in White City, Oregon and installed on homes between
> February 18, 2014 and September 1, 2014.
>
> Excluded from the Settlement Class are
>
> (1) all persons who timely opt-out of this Settlement under Federal Rule of Civil
> Procedure 23; (2) owners of multi-family and commercial buildings; (3) Plycem
> employees; and (4) the Judge to whom this case is assigned and any member of
> the Judge's immediate family.

Plaintiffs and Plycem agree that the Settlement Class includes tens of thousands of members.

36.    The Agreement provides for Settlement Class Members with the following

benefits, to be paid for from the Settlement Fund:

Settlement Class Members eligible for relief under the Settlement will receive

compensation for replacement product, labor, and related costs. The amount of compensation

depends on which compensation option the claimant selects, and accounts for a threshold level of

damage that will result in total elevation replacements. Settlement Class Members with

Qualifying Damage on less than 30% of an Elevation will receive compensation for the portion

of the elevation with Qualifying Damage. Claimants with Elevations experiencing Qualifying

Damage on 30% or more of an Elevation will be eligible for compensation for the entire

Elevation. Any claimant with an Elevation with less than 30% of Qualifying Damage will be eligible to receive an additional paint allowance to compensate for aesthetic issues associated with partial repairs of the Siding. Notably, the compensation will not be reduced to account for proration related to the age of the Siding.

As defined in section 1.23 of the Settlement Agreement, Qualifying Damage includes a board of Siding that has experienced cracking, bowing, shrinking, warping, breakage, or gapping (greater than 3/16"). Significantly, Replacement Area is defined as follows:

- For each Elevation where Qualifying Damage exists on 30% or more of the entire elevation, then that Elevation's Replacement Area will be the entire Elevation.

- For each Elevation where Qualifying Damage exists on less than 30% of the entire Elevation, then that Elevation's Replacement Area will be limited to the square footage containing Qualifying Damage

As described herein, Settlement Class Members will have the following three Options with regard to Qualifying Damage and the Replacement Area:

Option 1: "Replacement and Repair." The Class Member electing this Option will receive:

- $1 per square foot towards the cost of primed fiber cement board equal to the size of the Replacement Area

- $4.75 per square foot of Replacement Area to contribute to additional repair costs, including installation labor, paint, home wrap, trim, and all other repairs and/or incidental work ("Additional Costs");

- An additional $200 if the total Replacement Area is 20 boards or fewer; and

- a paint allowance of $1.00 per square foot for the entire Elevation where the Replacement Area is less than 30% of the Elevation.

This is the procedure for this option:

10

- Within 30 days after final approval of the Claim, the Claims Administrator will pay 30% of the amount of Additional Costs described above.

- The Settlement Class Member must then perform repairs, including replacing the Siding that was determined to be in the Replacement Area.

- The Settlement Class Member must provide proof of repair to the Claims Administrator, who must promptly review the proof and accept or deny it.

- Within 30 days after proof of repair is accepted by the Claims Administrator, the Claims Administrator will pay the remaining 70% of Additional Costs.

Option 2: "Quick Cash Option." The Claims Administrator will pay the Settlement Class Member $4.25 per square foot of Qualifying Damage. The Claims Administrator will pay 100% of the amount within 30 days of final approval of the Claim. This option provides compensation solely for Siding exhibiting Qualifying Damage.

Option 3: "Cash Option with Proof of Repair." This option is initially only available for claims with Qualifying Damage that does not exceed 30% of an Elevation. Under this option, the Claims Administrator will pay $4.25 per square foot of Qualifying Damage within 30 days after final approval. If the Settlement Class Member then provides sufficient proof of repair for the entire Elevation, the Claims Administrator will pay the Settlement Class Member $4.25 per square foot of the remaining portions of the Elevation.

37.    Further, Defendants have agreed that the costs of Notice and Administration Costs, Service Awards, Attorneys' Fee and reimbursement of costs will be paid from the Settlement Fund.

38.    The maximum amount of Attorneys' Fees and Costs for which Class Counsel may apply pursuant to paragraph 10.2 of the Settlement Agreement is 33% of the total value of the settlement, including the Settlement Fund (or up to $4,125,000.00, if based solely on the fund).

This amount was negotiated independently from the other terms of the Settlement after a settlement in principle was reached on all other material terms, under the supervision and with the assistance of Tom Wills.

39.     The benefits afforded by the Settlement reflect a reasoned compromise, which takes into consideration the risks inherent in all complex class litigation, and the numerous issues particular to this Action. Plaintiffs and Class Counsel are confident in the strength of their case, but they are also pragmatic in their awareness of the various defenses available to Defendants, including arbitration clauses, which are complex.  The risks and obstacles in this case are just as great as those in other product defect class actions and this case would likely have taken years to successfully prosecute, with the risk that there would be no recovery at all.  Recovery, if any, by any means other than settlement would require additional years of litigation in the district courts and on appeal.  If this Action was not settled and was required to proceed to trial, the Parties would incur significant additional expenses, including the further payment of expert witnesses and technical consultants, along with substantial time devoted to briefing Plaintiffs' motion for class certification, *Daubert* motions, and summary judgment motions, preparing for and conducting trial, post-trial motion practice, and appeal, all of which could have impacted the recovery in this Action. The proofs necessary to prevail at trial would be greater than what is required under the Settlement. Settlement Class Members may receive relief under the Settlement with certain documentation and an electronic Claim Form. Under the circumstances, Plaintiffs and Class Counsel appropriately determined that the Settlement is the best vehicle for the Settlement Class to receive the relief to which they are entitled in a prompt and efficient manner.

40.     In sum, the Settlement includes substantial benefits for Class Members and multiple options for recovery, including options not otherwise available under the Warranty, options of full replacement of elevations meeting the threshold 30% requirement of Qualifying Damage, and a quick cash option.  The Settlement is fair and reasonable in light of Defendants' defenses, and the challenging, unpredictable path of litigation Plaintiffs would have faced absent a settlement.

**The Skill, Experience, Reputation, and Ability of Class Counsel**

41.     Class Counsel has significant experience in the litigation, certification, trial, and settlement of national class actions, including numerous claims against appliance and product manufacturers, and have recovered hundreds of millions of dollars for the classes they have represented.  Class Counsel includes firms with appellate expertise, which was used to extensively analyze the chances of success in both the Federal Appellate Courts and the U.S. Supreme Court. The experience, resources, and knowledge Proposed Class Counsel brings to this Action is extensive and formidable.

42.     Class Counsel have devoted substantial time and resources to this Action, including more than 3400 hours of work to date, and are qualified to represent the Settlement Class, and will vigorously protect the interests of the Settlement Class.

43.     These hours were reasonable in light of the complexity and procedural posture of the case, and care was taken to avoid duplication of efforts and appropriately divide tasks amongst Plaintiffs' Steering Committee members. Similarly, a reduced number of those members attended mediation also to avoid duplication of time.

44.     As previously submitted, the resumes of Class Counsel are extensive and demonstrate experience in prosecuting complex class actions.  *See* ECF No. 24-2 (Class Counsel

Resumes).

45.    As detailed in my firm resume, I am a founding partner of Whitfield Bryson, LLP, and have spent more than 32 years representing individuals in building product and consumer class actions, mass torts, and various other types of litigation. I have tried numerous cases, many of which have resulted in multi-million-dollar verdicts.  As discussed above, I have been appointed as Lead Counsel in multiple building product cases consolidated into multi-district litigation, and has served on several Plaintiffs' Steering Committees and in other leadership positions.  Many of those class actions have likewise resulted in multi-million-dollar settlement recoveries for consumers.  Similarly, I have been appointed as Class Counsel in numerous actions certified by courts.  Consequently, I am a frequent lecturer and writer on a variety of building product class action, insurance, and mass tort related disputes.  I have been quoted by a variety of media outlets over the years, including the Wall Street Journal, Washington Post, New York Times, Law360, and Lawyers Weekly to name a few. I have been named as a member of the Legal Elite and Super Lawyers in North Carolina on numerous occasions.  I have been awarded the designation of one of the Top 25 lawyers in Raleigh by Charlotte Magazine for a number of years including 2020.  I am on the Executive Board and Vice-President of the Public Justice Foundation Board.  Public Justice is a nationwide public interest law firm. I am also an adjunct professor at Campbell Law School in Raleigh, NC, where I teach "Introduction to Class Actions and Multi-district litigation."

46.    Other members of my firm who contributed to this litigation are also very experienced in class action, and building product litigation, including Scott C. Harris and Harper T. Segui.  Harper T. Segui, who contributed more hours than any other lawyer in this litigation, was a member of the Plaintiffs' Steering Committee in this litigation, as well as in *In re Windsor*

14

*Windows Wood Clad Window Products Liability Litigation*, MDL 2688, in the United States District Court for the Eastern District of Wisconsin. She likewise played instrumental roles in litigating other building product based multidistrict litigation, including *In re MI Windows and Doors, Inc. Products Liability Litigation*, MDL 2333, in the United States District Court for the District of South Carolina, and *In re Pella Corporation Architect Designer Series Windows Products Liability Litigation*, MDL 2514 in the United States District Court for the District of South Carolina.

47.    Class Counsel, comprised of the Plaintiffs' Steering Committee, have lengthy representative cases, collectively totaling over a billion dollars in recoveries in complex class actions and mass torts cases. *See* ECF No. 24-2 (Class Counsel Resumes). Most have served in numerous leadership positions, including Co-Lead counsel, Class Counsel, and Steering Committee positions. *Id.* Therefore, the Adjusted Laffey Matrix rates utilized as support for the lodestar crosscheck are more than reasonable in light of the experience, skill, and expertise brought to this litigation by Class Counsel.

48.    Additionally, Class Counsel have made every effort to litigate this matter efficiently by coordinating the work of all attorneys and paralegals, minimizing duplication, and assigning tasks in a time and cost-efficient manner, based on timekeepers' experience levels and talents. Thus, Class Counsel organized and cooperated amongst each other to prosecute the claims of the Plaintiffs in an efficient and non-duplicative manner.

49.    In pursuing this Action on behalf of Plaintiffs and the Settlement Class, Class Counsel's firms expended more than 3,400 billable hours to this litigation, often in blocks of time that prevented engagement in other matters. As Class Counsel continues to be involved in claims administration, any objections that may be filed, drafting of the Motion for Final

Approval of Class Settlement, preparation and participation in the Final Fairness Hearing in May, numerous additional hours will be expended in the future.

50.     The accompanying Motion sets forth the extensive tasks that were performed in this action, including the substantial investigation of claims and defenses through expert investigation, consumer interviews, discovery, hard-fought litigation of Defendants' motions to dismiss, and contentious, arms-length negotiations over the course of just over one-year to ensure the fairness and adequacy of the Settlement.

51.     The aforementioned billable hours calculation was prepared from contemporaneous detailed daily time records regularly prepared and maintained by Class Counsel utilizing timekeeping software.  In Class Counsel's opinion, the time spent by attorneys and staff of our firms was reasonable and necessary.  Indeed, by prosecuting this case purely on a contingency basis and not being paid by the hour, Class Counsel worked efficiently and avoided unnecessary work.

52.     Likewise, the hourly rates provided by the Laffey Matrix are conservative in light of the complexity of this building product case, and rates utilized by lawyers of this level of experience and skill set around the country.

53.     Further, in pursuing this Action on behalf of Plaintiffs and the Class, our firms expended and advanced $102,771.46.  *See* Exhibit B.

54.     As previously indicated, Class Counsel anticipates that they will spend additional time and incur additional expenses between the date of this filing and the Final Approval Hearing in connection with preparing for and attending the Final Approval Hearing. Moreover, additional attorney time will be devoted to this case including for preparing the Motion for Final

Approval, supervising aspects of the administration of the Settlement, answering Settlement Class Member questions, and helping resolve any issues that arise.

55.    Further, Class Counsel intends to complete any confirmatory discovery that may be needed, as provided by the Settlement Agreement, and otherwise including inspections of homes and to aid in with the filing of claims.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on January 7, 2021

/s/ Daniel K. Bryson
Daniel K. Bryson
**Whitfield Bryson LLP**
Lead Counsel

17

**Master Attorney Fee Time**

*Name        Hours        Rate        Total*

**Whitfield Bryson**

| | | | | Hours | $$ |
|---|---|---|---|---|---|
| DKB | 307.2 | 800 | 245760 | 1857.21 | 1064099 |
| HTS | 873.6 | 650 | 567840 | 463.65 | 279080 |
| SCH | 294.75 | 650 | 191587.5 | 129 | 78331.5 |
| JRW | 0.6 | 400 | 240 | 251 | 183620 |
| NCL | 1.5 | 400 | 600 | 50.9 | 36866.4 |
| JCW | 1.75 | 800 | 1400 | 640.4 | 374295 |
| Para | 377.81 | 150 | 56671.5 | 14.4 | 6480 |
| | 1857.21 | | 1064099 | 3406.56 | 2022772 |

**Segui Law Firm**

| | | | |
|---|---|---|---|
| PWS | 324.4 | 800 | 259520 |
| AB | 4.5 | 300 | 1350 |
| MV | 76.8 | 400 | 30720 |
| AMB | 95 | 650 | 61750 |
| Para | 139.7 | 150 | 20955 |
| | 640.4 | | 374295 |

**Greg Coleman Law**

| | | | |
|---|---|---|---|
| GC | 198.15 | 800 | 158520 |
| RS | 192.4 | 650 | 125060 |
| MES | 1 | 800 | 800 |
| LAW | 13.9 | 600 | 8340 |
| JD | 0.1 | 400 | 40 |
| WAL | 9.7 | 400 | 3880 |
| JHG | 3.8 | 400 | 1520 |
| RPM | 29.4 | 600 | 17640 |
| Para | 15.2 | 150 | 2280 |
| | 463.65 | | 318080 |

**Gustafson Gluek**

| | | | |
|---|---|---|---|
| MJL | 73.5 | 650 | 47775 |
| RB | 10 | 600 | 6000 |
| JSK | 24.75 | 800 | 19800 |
| DEG | 1.25 | 800 | 894 |
| LSW | 2.25 | 400 | 900 |
| DAG | 0.75 | 650 | 487.5 |
| Para | 16.5 | 150 | 2475 |
| | 129 | | 78331.5 |

**Levin Papintonio**

| | | | |
|---|---|---|---|
| BC | 216.8 | 800 | 173440 |
| BG | 0.3 | 400 | 120 |
| MS | 2 | 800 | 1600 |
| RT | 14.7 | 400 | 5880 |

EXHIBIT A

| Para | 17.2 | 150 | 2580 |
| | 251 | | 183620 |

**Simmons Hanley**

| MB | 31.5 | 800 | 25200 |
| BB | 2 | 300 | 600 |
| AT | 17.4 | 600 | 11066.4 |
| | 50.9 | | 36866.4 |

**Local Iowa**

| KL | 13.6 | 450 | 6120 |
| MB | 0.8 | 450 | 360 |
| | 14.4 | | 6480 |

**Copies and Postage**                 553.26
WB          65.24
GCL         43.4
GG          48.68
LP          274.75
SLF         121.19


**Research Fees**                      2,363.64
WB          1072.32
GCL         576.34
GG          192.41
LP          522.57


**Delivery/Service Fees**              1243.99
WB          12.85
SLF         496.19
GG          354.2
SCH         380.75


**Travel**                             43357
WB          21903.51
SLF         1395.32
GG          3752.47
SHC         2537.82
LP          8472.11
GCL         5295.77


**Meals**                              6252.93
WB          4654.2
SLF         1598.73


**Court Fees**                         5468.55
WB          3137
SLF         150
GG          449.2
KL          400
SCH         395.25
LP          937.1


**Phone Conferencing**                 14.1
WB          9.48

EXHIBIT B

LP                4.62


**Mediation (Non-Lit Fund)**          2828.25
WB          2828.25

**Homeowner Meeting**                270.63
SLF          270.63


**Lit Fund (Mostly Expert Costs)**      38500
WB          12500
GG          6500
SCH          6500
LP          6500
SLF          6500

**Lit Financing Costs**              1919.11
WB          1919.11


**TOTAL**                    102,771.46